IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 4:17-CR-00203-DPM |
| | ) | |
| CORNELIUS THOMPSON | ) | |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through its counsel, Cody Hiland, United States Attorney for the Eastern District of Arkansas, and Liza Brown, Assistant United States Attorney for said district, respectfully requests that this Court deny the defendant's motion for compassionate release from the Bureau of Prisons (BOP) because compassionate release is not warranted in this case.

The defendant was sentenced by this Court to a total of 24 months' imprisonment in the BOP on June 30, 2020, for conspiracy to possess with intent to distribute and to distribute cocaine. The defendant received cocaine that he sold to others as part of a drug distribution ring. Phone intercepts conducted in September 2016 intercepted calls between the defendant and a codefendant regarding the sale of cocaine. The defendant was determined to be responsible for more than 100 grams but less than 200 grams of cocaine.

The defendant filed the instant motion on December 6, 2020. In the motion, the defendant asserts that he should be granted compassionate release in light of the COVID-19 pandemic because he has underlying medical conditions that place him at risk of developing complications from the virus. The defendant submitted a request for compassionate release to the warden of his facility on October 9, 2020. This Court should deny the motion because compassionate release is not warranted in this case.

## I.   COMPASSIONATE RELEASE IS NOT WARRANTED

The defendant bears the burden of showing that compassionate release is appropriate. *United States v. Johnson*, No. 4:00-CR-40023, 2020 WL 1434367, at *1 (W.D. Ark. Mar. 24, 2020). This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either (1) "extraordinary and compelling reasons warrant such a reduction," or (2) the defendant is at least 70 years old and has served at least 30 years in prison, and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[1]

The pertinent policy statement is set forth at United States Sentencing Guidelines (U.S.S.G.) § 1B1.13.  It prohibits this Court from reducing a defendant's sentence unless the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

The Sentencing Commission also provided explicit examples of what constitutes an "extraordinary and compelling circumstance":

(A)   **Medical Condition of the Defendant.**—

    (i)   The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)   The defendant is—

---

[1] Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release.  Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples."  The statute also states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

    (I)  suffering from a serious physical or medical condition,

    (II)  suffering from a serious functional or cognitive impairment, or

    (III)  experiencing deteriorating physical or mental health because of the aging process,

   that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

 (B) **Age of the Defendant.** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

 (C) **Family Circumstances.** —

   (i)  The death or incapacitation of the caregiver of the defendant's minor child or minor children.

   (ii)  The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

 (D) **Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

 **A.** **The defendant's condition and the current pandemic do not justify compassionate release of the defendant.**

Here, the defendant is not claiming that he is suffering from a terminal illness or serious physical or medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(i), (ii). Even when a prisoner is suffering from an illness, a reduction in sentence due to a medical condition is a rare event. *See United States v. Mitchell*, No. 5:10-CR-50067-001, 2020 WL 544703, at *3 (W.D. Ark. Feb. 3, 2020).

Concerns about potential exposure to COVID-19 are not sufficient to justify compassionate release. *See United States v. Eberhart*, No. 13-CR-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13."); *see also United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (quoting *Eberhart*); *United States v. Zywotko*, No. 219CR113FTM60NPM, 2020 WL 1492900, at *2 (M.D. Fla. Mar. 27, 2020) (same). The defendant is 44 years old. His medical records reflect that he has been diagnosed with congestive heart failure and that he is obese, both of which are recognized as risk factors for COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The defendant has been diagnosed with hypertension, which is recognized as a potential risk factor associated with COVID-19. *Id.* In addition, he has an eye condition that requires him to wear contacts, and he expresses concern that he could contract the virus via his eyes due to the contacts. However, there is no indication that the BOP has failed to provide him with any necessary cleaning supplies for his contacts. It does not appear from the medical records that the defendant's medical conditions are causing any issues at the present time. He notes in his motion that he experienced an episode of chest pain, accompanied by high blood pressure on November 5, 2020, which he attributes to a change in his blood pressure medication. However, the report from that date indicates that the defendant was more concerned about the change to his medication, which involved a change from one type of medication to another, than the actual symptoms he experienced. He was told to return if his symptoms changed or worsened, and there is no indication

from his medical records that he has done so. The United States can provide the Court with the defendant's medical records if deemed necessary for a determination in this matter.

The United States maintains that the existence of COVID-19 does not constitute an extraordinary and compelling reason warranting compassionate release. However, recently, the Department of Justice has refined its position on compassionate release as follows: "under present circumstances, an inmate's diagnosis with a medical condition that the CDC has identified as a risk factor for COVID-19, and from which the inmate is not expected to recover, presents an 'extraordinary and compelling reason[]' that may warrant compassionate release if other criteria are also met." 18 U.S.C. 3582(c)(1)(A). Therefore, if the Court determines that the defendant has a medical condition that the CDC has identified as a risk factor for COVID-19, and from which the inmate is not expected to recover, this Court could reasonably find the existence of an extraordinary and compelling reason if the other criteria are also met. However, in this case, the remaining criteria are not satisfied because the defendant would pose a risk to the community if he were released.

### B. BOP's COVID-19 Action Plan

Further, in an effort to mitigate the spread of the virus in its detention facilities, BOP has instituted a five-phased COVID-19 Action Plan to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating persons sentenced or detained based on judicial orders. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at www.bop.gov/resources/news/20200313_covid-19.jsp; *see also Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789 (8th Cir. 2016) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011), for the proposition that courts have the authority to take judicial notice of government websites). The defendant has not demonstrated that the plan adopted by the

BOP is inadequate to either manage the outbreak or provide treatment for inmates who fall ill. *See United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. March 19, 2020); *see also Clark*, *supra*.

- Phase 1:  In January 2020, the BOP established a task force to begin planning for potential coronavirus transmissions, and to build on its existing procedures for pandemics.

- Phase 2:  On March 13, 2020, the BOP implemented aggressive measures to prevent and mitigate the risk of COVID-19 transmission into and inside its facilities, including:

    - Screening of Inmates and Staff:  All new BOP inmates are screened for COVID-19 symptoms and risk of exposure.  Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols.  In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (staff registering a temperature of 100.4 degrees F or higher will be barred from the facility).

    - Quarantine Logistics:  All BOP institutions establish quarantine areas within their facilities to house any inmates found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

    - Suspension of Social Visits and Tours: BOP placed a 30-day hold on all social visits and tours.

    - Suspension of Legal Visits: BOP placed a 30-day hold on legal visits, with exceptions permitted on a case-by-case basis.

- o   Suspension of Inmate Movements: BOP ceased the movement of inmates amongst its facilities for at least 30 days, with exceptions for medical treatment and other exigencies.
- o   Modified Operations:  BOP facilities modified operations in order to maximize social distancing.
- Phase III:  On March 18, 2020, the BOP implemented an action plan for locations that perform administrative services to allow for maximizing telework. All cleaning, sanitation, and medical supplies were inventoried. Ample supplies were determined to be on hand and ready to be distributed or moved to any facility as deemed necessary. The BOP placed additional orders for supplies, in case of a protracted event.

https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (pertaining to phases I-III).

- Phase IV:  On March 26, 2020, the BOP implemented revised preventative measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

- Phase V: On April 1, 2020, in response to a growing number of quarantine and isolation cases, the BOP directed the following actions be taken immediately to further mitigate the exposure and spread of COVID-19:
    - For a 14-day period, inmates in every institution be secured in their cells/quarters to decrease the spread of the virus.
    - During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
    - The BOP is to coordinate with the United States Marshals Service to significantly decrease incoming movement during this time.
    - After 14 days, this decision will be reevaluated.
    - Limited group gathering will be afforded to the extent practical to facilitate, commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

*See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (phases IV-V). Further details regarding the BOP's COVID-19 action plan and efforts are available at https://www.bop.gov/resources/news/20200313_covid-19.jsp and https://www.bop.gov/coronavirus/index.jsp.

As of December 21, 2020, the BOP's website indicates that Oklahoma City FTC, the facility where the defendant is incarcerated, has thirty-one inmates and fifty-one BOP staff members who are positive for COVID-19. *See* https://www.bop.gov/coronavirus/. No persons will be admitted to BOP facilities without being screened for symptoms and risk of infection, and the

8

BOP is taking precautions as set forth above. There is ample evidence of widespread COVID-19 transmission and clustering outside of BOP.

### C.     BOP has the authority to release inmates on home confinement, if necessary.

BOP has been granted wider authority to designate inmates for home confinement in its toolkit of available measures. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." It does not appear that the defendant would be eligible for home confinement, as he has only served approximately one-quarter of his sentence.

### D.     The defendant remains a danger to the community.

This Court may not reduce the defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.  The record in this case precludes such a finding.

Under 18 U.S.C. § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger:  (1) the nature and circumstances of the offense charged; (2)

the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Consideration of these factors—which are not affected by COVID-19—does not allow this Court to conclude that the defendant is not a danger to the safety of any other person or the community.

The defendant has a history of offenses involving drugs and firearms. In May 1996, the defendant was convicted of possession of a controlled substance. (Cornelius Thompson PSR). He was convicted of carrying certain prohibited weapons in December 1997. *Id.* The defendant was again convicted of possession of a controlled substance in April 2001, and the term of probation he received was revoked in June 2001. *Id.* In November 2001, the defendant was convicted of being a felon in possession of a firearm. *Id.* The defendant was also convicted of terroristic act and battery first degree in November 2001. *Id.* He and another individual were seen running to a vehicle while carrying guns immediately after several shots were fired into an apartment, striking two children who were sleeping inside. *Id.* The defendant was convicted of possession of cocaine after he was stopped while driving a vehicle inside which was a safe that contained $25,845 and .2 grams of cocaine residue. *Id.* He was convicted of possession of marijuana in December 2010, after he was found to have 16.89 grams of cocaine and $254 in his pockets during a traffic stop. *Id.* The defendant's PSR reflects additional arrests for manufacture, possession, and delivery of a controlled substance; unlawful possession of a weapon in a public place; simultaneous possession of drugs and firearms; intimidating a witness; and criminal use of property. *Id.* The defendant also

reported prior use of marijuana and cocaine, with the reported last use of both substances occurring in his early twenties.

Not only does the defendant present a danger to the community, but the community itself is more vulnerable to such danger given the COVID-19 pandemic. A defendant who is unable to comply with conditions of release poses risks to law enforcement if required to attempt to locate and arrest the defendant, as well as the United States Probation Office tasked with supervising him. Because first responders are focused on mitigating the effects of the COVID-19 outbreak, they are less equipped to prevent and respond to wrongdoing.  Indeed, as a district court in Maryland recently observed, installation of location-monitoring tools now poses a risk to United States Pretrial Services officers "given the current recommendations regarding implementation of social distancing."  *United States v. Martin*, 2020 WL 1274857 (D. Md. Mar. 17, 2020). Irresponsible social habits endanger the community, and the current guidance largely relies on voluntary compliance. A person who ignores rules and admonitions could increase infection rates. The Court should consider the defendant's demonstrated history of violating the law, including actions that showed no regard for the welfare of others. The motion fails to sufficiently address the untenable strain on the resources of law enforcement, the pretrial services office and the Court. Potential exposure to the virus is a reality confronting everyone in the United States and around the world.  Releasing the defendant will neither eliminate the possibility of exposure nor satisfy the requirements of the statute.

If this Court determines that release from BOP is appropriate in this case, the United States respectfully requests that this Court order a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public.

**Wherefore**, the United States respectfully requests that Defendant's motion for compassionate release be denied.

        Respectfully submitted,

        CODY HILAND
        United States Attorney

        By:  Liza Brown
        Bar No. 2004183
        Assistant United States Attorney
        P.O. Box 1229
        Little Rock, Arkansas 72203
        (501) 340-2600
        Liza.Brown@usdoj.gov